The case this morning is MOMENTA v. AMPHASTAR. Ms. Millett. May it please the Court. I'm Patricia Millett and I'm here on behalf of the appellants in this case. The question for this Court at this stage of proceedings is whether there are substantial questions of law that make the issuance of a preliminary injunction in this case erroneous. And before those questions can be assessed, a couple of basic terminological factors need to be laid down. Anoxoprine, the generic drug at issue in this case, is a life-saving drug. It is also made through a very complex and sensitive process that requires, as relevant here, the presence of a sugar called 1,6-AS in the briefs. It has to be present in a certain percentile range of 15 to 25 percent. If that percentage is not there, of that sugar, it is not anoxoprine. It is not anoxoprine. It has to have that percentile. The FDA... You have to test for that. You have to reject the batch if the testing turns out wrong. But what happens at that point if you don't do the testing properly? What are the consequences under the statute? The consequences under the statute or the real-world consequences can be life-endangering. No, forget about the real-world consequences. It's kind of hard. Don't forget. Under the statute. Under the statute, if we do not comply with it, the testing is mandated. The batch approval, batch-by-batch approval in testing is mandated by FDA regulation. It is also... And that's attached. That regulation is attached to our reply brief to 11-165. In addition, we had to make promises... No, but what are the consequences under the statute if you do not do the required testing? Then it is not an authorized release. It would be an unauthorized release. And, in fact, we had to make these to get the answer. What about the sale of an adulterated drug? Well, it may not be... Well, it depends on how it happens. Because you don't do the testing at all, it might not be adulterated. If it so happens it had the correct percentage, so it might not be physically adulterated, but it would be unauthorized because it is a condition. It's a promise we have to make and a promise we have to keep as a condition of bringing this up to the market line and to the sale line. Now, obviously, if it didn't have the content, it would be adulterated, and it would be a violation of law for us. But what happens if you make an unauthorized sale? We can make an unauthorized sale. If it's found out, then the FDA can go through the civil sanctions process, because I suppose if it became dangerous enough, it could ultimately result in liability to individuals if it harms somebody. But it is a condition of our approval, and they have the authority, as a regulatory agency, if we do not comply with our conditions, to withdraw that approval. And any civil agency has sanctions, civil sanctions, and again, something like this, I suppose, could result in criminal if it came to cause the life-threatening harms that it has potential. Before we get into the merits of the reasons that you think a stay should be granted of the injunction or that the injunction should be vacated, let me ask the harm. I understood from some material in the appendices that there was $65 million of the drug sitting in a warehouse that was due to expire both December 31st and then January 1st. Unfortunately, those days have come and passed, so that harm is realized. I know there's a bond of $200 million. Oh, $100 million. $100 million? Forgive me, but yes, and that's one of the problems here. Presumably, so those are covered. But I understood from your reply brief that there continued to be a large amount of potential damages from possible loss of customer base by being unable to. I'm trying to dance around what might be confidential information. But loss of customer base, is there a continuing threat is what I'm wondering. Absolutely, and I think it's on page 30 of our reply brief. We lay it out, and the allegations are there. And as you say, with any drug like this, it's not only what you made that expires, but it's the lost opportunity. And we talk there about these drugs, they're not sold one pill at a time or one injection at a time. Multi-year contracts is how this is done. And we explain there in the brief, the citation on page 30, there were four-year contracts worth $50 million a year. That's $200 million right there. And once that contract process is gone, it's gone for four years. Now, I assume since you're saying this stuff, I was being careful because I thought some of it was designated confidential. I'm assuming since you're saying it in open court, it's fair game for an opinion if an opinion would need to rely upon it. The fact that these things are done through multi-year contracts, yes, is appropriate, and then more details about that. But I think as long as you're mentioning the harm, I think one thing that's very important to keep in mind here, of course we deal with balancing of harms on preliminary injunction, they're raising the wrong harm. What they talk about, this is a testing method. It is not an entitlement to block the drug being made or the drug being sold. It is a testing method, but their harms are not addressed in terms of what the harm is from us using their testing method. Their harms are all about what happens if you come into the market. But then they argue, well, you can do some other testing method to get around the safe harbor issues that we've raised. So they don't match. Our harms are shut down by this injunction because of compliance with the FDA-mandated testing method. Their harms should have been articulated in terms of how using their test harms them, and not just generally, but in the very narrow window between now and the trial date. How about we move on now to your merits, because you're running almost out of time, believe it or not. You're going to get near your rebuttal time soon. So do you want to tell us how this case differs from Clawson and why 271E1 insulates your client? Yes. So this is very different from Clawson in Clawson's very terms. Clawson said that it was not addressing testing that had to be done for regulatory approval by the FDA. This does batch-by-batch testing. Approval comes with the batch-by-batch testing, the 211.165 regulation. Clawson, in terms, said we're not addressing... Clawson says the statute does not apply to information that may be routinely reported to the FDA long after marketing approval has been obtained. It sets a pre-post line. This is post. No, I think it's the post what is the relevant question, and the holding in that case... Marketing approval. The holding in that case was dealing with something that was both approval and post-sale, and that sale language does actually appear in the statute at issue here in 241. But the question is... But pre-marketing approval, marketing approval, I can find about eight places here on one page where Clawson says that. And, of course, we're focused on the holding here, and it said that at the same time it said we're not talking about information that has to be collected for regulatory approval process. So it has to be read in light of that language, and it also said in terms we are not addressing showings of bioequivalence. That has to be read in light of that. And then understand the facts of that case. That was a completely voluntary post-sale, post-out-on-the-market determination to run a test that was not mandated by the FDA. Now, if you got bad results, then you had to turn it in, but that was a voluntary effort. This is before sale. It's not approved. It is not approved until a batch is tested. Extensive precedent recites the purpose of the safe harbor is to facilitate market entry. I mean, you can't overlook that this whole thing is setting up a pre-post line, isn't it? We can't go into the market under 211.165 unless we've done this test first. This is our starting gate. We can't sell it. It is not approved by the FDA. The problem here is you can't. You're saying that this is a requirement for marketing the drug. You cannot. Yes, you have to. That's 211.165, the CFR regulation attached to our reply brief, and it talks there about approval batch by batch that you have to do. And understand with these drugs, approval is not a red light, green light in this context. You have to make sure every time that what you're selling is what they've approved you to sell. It's approved if verified is what we have here. This is a flashing red light all the time. It's only approved if verified, and this is the verified testing that we are doing here. And that is why this is completely different from Klassen, and it would be very much to put on Klassen's shoulders to say it's shutting down this process, which was pre-approval, pre-batch approval, pre-sale. Okay, but suppose we accept the proposition that this is a pre-marketing requirement. In other words, you can't sell the drug without running these tests. Yes. But is it a pre-marketing approval requirement? I guess it's the problem. Right, and my point is that approval is not the binary world that sometimes is assumed, that you just get a red light, a green light. The and has been approved, right? The and has been approved, but the sale has not. And 211.165, again, this is attached to our reply brief, the regulation, conditions for their approval and release. So you have the and approval, but you have batch approvals, and you have to have that because, as I said, it can't be sold until we've verified the existence of this percentage, and you have to do that on a batch-by-batch basis. It's the nature of this type of drug that you have the flashing red light from the FDA. There's no green light. This regulation is our flashing red light. And to put on plasm, the very dangerous line, that it is not going to protect doing the one test in this narrow situation, the one test where the FDA has mandated that we do it before we can get out of the starting gate, is to draw a line that is not only outside of the text of the statute, but doesn't make sense with the nature of these drugs. If there are any further questions, I would just like to quickly say so that I don't unfairly say something in rebuttal. Where does the regulation that you cited that was attached to the brief refer to approval? I'm sorry. You said that the regulation attached to your reply brief uses the word approval. 211.165. So it's Addendum 1 to our reply brief. And in D? D. The second line of the condition, further approval and release. I would simply like also to say that we believe there are substantial legal questions about written description and enablement here. You cannot claim scientific processing. Those weren't raised before the district court, were they? They were raised before the district court, both in the preliminary injunction filing in a footnote and then in the motion to reconsider within ten days of the decision within the appeal period. They're before this court. They're purely legal questions. They were briefed below. There's no prejudice. And you cannot have scientific methods when you have zero parameters provided. And if you just contrast USP-207 and how it tells to do the HPLC test with their patent, there's a chasm between them. Thank you. Thank you, Ms. Miller. Mr. Frank? Thank you, Your Honor. May it please the Court, my name is Robert Frank, and I represent Momenta and Sando. The task of developing a generic enoxaparin was incredibly difficult. Enoxaparin is the test. You are required to run that test before you can market a particular batch, right? Yes and no. You are required to run a test to determine the presence of the 1,6-anhydro ring structure. You are not required to run this test. Okay, but you are required to run a test before you can sell it. Yes. Before you can market it. Yes, that is correct. Let me turn to the Classroom 271E1 question. Tell me why you're not required to run before you switch. Why aren't you required to run this test? The FDA requires that you test for the presence and amount of the 1,6-anhydro structure. The FDA has said publicly in documents cited in our brief and included in the- I mean the citizen petition that was actually a response. And they'll be requested to lay the end up. Yes, that, yes. Two, in their reply brief, they acknowledge that the FDA will allow a test which it deems to be equivalent or better than this particular test. I don't care whether they acknowledge it or not. If the statute expressly requires the adoption of this test- I'm sorry, Your Honor. I interrupted you. I didn't mean to. If the statute did, suppose the statute says you must use method 207. Yes. Two, crystal clear, indisputable. Would the FDA be free to modify that clearly? Which of Congress? The- I want to challenge the premise. I know, but don't. Just work with my hypo for a second. The statute says that- 271E1 says that information that is solely related to purposes of submitting it, information to the FDA is exempt from infringement. What we're talking about here is an act which constitutes patent infringement. I don't think you're answering my question at all. I'm sorry. For example, in 21 U.S.C. 351, if instead of saying you must use the methods articulated in the USP, if instead of saying that, it actually said you must use method 207. If the statute said that, there still would not be a protection from infringement because this is conduct which occurred. This relates to the manufacture of product after product approval, and 271E1 is under CLAWSON. So even if the statute expressly required the use of method 207, you would say that CLAWSON controls post-approval and that they just can't use it without infringing. The answer to that is yes. Yes, I would say that. But you don't believe the statute actually does require the method of 207. You wanted to fight my initial premise, and so I'd like you to explain why. First, USP itself says that a test which is as reliable or more reliable will be acceptable. Second, the FDA has said that it will accept any number of tests. Third, the representation is made, and so what the argument... You're going a little fast for me. Where does the USP say any test that is deemed equivalent can be accepted? Because I'm in the USP, the compendium. It's in the General Notices and Requirements of the USP, Section 6.30. An alternate test must be shown to give equivalent or better results. Is there any such test which has been shown to give equivalent results to the 207? Yes. What is that? It is a test using an NMR procedure. Where do we find that in the record? You cannot find that in the record. Nor can you find anything in the record that indicates that an alternative procedure would not be acceptable. Well, that's a little... Wouldn't that, in effect, be your burden since the USP, the official compendium, expressly says, use method 207. If you want to argue that there is some other alternative available method, wouldn't you need... With due respect, Your Honor, the USP compendium does... The monograph does not say use 207. The USP monograph does not speak to the test that should be used. On page 369 of the appendix, the following procedure is used to determine the level of the 1,6 derivative. The assay involves HPLC analysis. Isn't this a recipe for your method 207? On page 269. I'm on page 369. I beg your pardon. See where it says 207 in brackets? Oh, yes. There is a test which has been specified, which has been identified by the USP. It is the 207 test. But the USP monograph for enoxaparin does not say that that test must be used. And the FDA does not say that that test must be used. The USP doesn't say that test must be used. The USP monograph does not say that. But the statute itself says you must use the method in the USP. And this is the only method disclosed for determining exactly the percentage between 15% and 25% of the 1,6 derivative. I believe that what the statute says is you must use the test that's called out in the USP monograph for that product. The USP monograph for that product does not require the use of the 207 method. And the USP's general notices and requirements say that you may use an alternate test if it is established to be as good as or better than the selected test. Am I wrong? Section 351 of the statute says purity shall be made in accordance with the test or methods of assay set forth in the compendium. It doesn't really leave a lot of ambiguity. I believe that the compendium is a reference to the USP monograph for enoxaparin. The official compendium means the official United States pharmacopoeia. Pharmacopoeia. USP. That's what I keep calling it to avoid having to say those words. Yes, Your Honor. And the fact is that the FDA has said expressly and publicly that it will accept other tests. And there is no record evidence. And, therefore, this conduct is a choice to follow a particular method that is made by the infringer. So what? I mean, what does 271 have to do with that? I mean, it doesn't say you only get the safe harbor if there's only a single test method, right? Correct. And further, I'd say, Your Honor, we are talking about a method of manufacture that takes place after FDA approval. But it's still a marketing requirement. It is a requirement that you follow a whole series of procedures. Every step in the manufacturing process must be followed. In order to market. In order to market, yes. And every step in the manufacturing process, there must be a record kept of it. A record kept. That wasn't true in Klausen. The testing wasn't a requirement that related to marketing, right? Klausen is different in the sense that there was a requirement that data be submitted to the FDA in certain circumstances. But it wasn't a requirement for marketing. It was not a requirement for marketing. In this case, the FDA requires that each step in the manufacturing process, the record be kept of that. And that starts with the ingredients and ends with the packaging. Every step in the production of a patch, every production control method must be recorded and the records retained. And if the FDA wants, they can come and inspect them. But there's no requirement here and there is no evidence that any record was ever submitted to the FDA with respect to these processes. So the 271E1 argument here is that simply because you must keep a record of a step in the manufacturing process. Yes, but the regulations require that you submit the data if it's requested, right? The regulations require that the records be maintained and that they are kept available for FDA inspection for a defined period of time. And every one of the steps, once you commit to following those steps, every one of those steps must be performed, every single step. And therefore, if what we're talking about here is a situation in which the performance of any one of those steps is exempt from infringement under 271E1, I respectfully suggest that the court will have established an enormous, enormous exception with respect to the manufacture of pharmaceutical products that will affect all sorts of patents, anything on their argument, anything of which a record must be kept, any step which must be followed, and every step must be followed once you commit to following those steps. Every single one of those things, according to the Amphistar argument, is exempt from infringement. And every one of those steps is a step that takes place after product approval. I was going to read the language from the Clawson case that Judge Rader read, and I won't spare you that. But the whole purpose of Section 271 is to allow people to get in the market immediately after patents expire to get the FDA approval. The purpose of the statute has nothing to do with steps that you take during the manufacturing process long after approval. There's no shred of paper that has been submitted to the FDA with respect to this. Let me turn to the harms because I want to pick up on something that was said on the other side. This is a situation in which Amphistar urges that it be allowed to produce price erosion. It argues that there will be a harm to market share. This court held as recently as two weeks ago in the Celsus in vitro case that harms of that type constitute irreparable harm in a preliminary injunction context. There's evidence that when this product was introduced, Momenta, which is a one product company, its stock went down 30% in a single day. These events will convert it from a company that was comfortably profitable to a company that's losing money. The effect on Momenta, I can't tell you what it won't invent as a result of that. I can't tell you what will be delayed. I can't tell you what effect it will have on its ability to employ and retain people. I can tell you that on one day, 60% of all the stock options in this company were underwater in a single day. There's an argument made that was not made orally this morning, but that we somehow misled the court. The district court specifically held that we did not. The issue there had to do with the fact that we pointed to the risk that Sanofi Aventis would sell an authorized generic. The facts, as we now know, are that shortly prior to the issuance of the TRO, Winthrop, the Sanofi Aventis company, did begin such sales efforts. It approached a total of three clients. The TRO entered actually on the same day that they had begun those sales efforts, and they ceased all new sales efforts at that point. The court found that in the circumstances, the injunction was effective to prevent yet another type of harm that would be irreparable, which is the effect on the market of a new entrant. Let me pause and just talk about infringement for just a couple of seconds. The claim here is the use of a separation method to determine the presence of a structural signature of an oxyparin. They use a process called HPLC. They admit that HPLC is a separation method. They argue that you should interpret the claim, the use of a separation method, to mean the use of capillary electrophoresis, which is a particular separation method. They argue that there is a specific dependent claim that requires the use of capillary electrophoresis. So on their construction, you would have to conclude that what the claim means is the use of capillary electrophoresis to determine the presence of a structural signature of an oxyparin, wherein the structural signature is determined by the use of capillary electrophoresis. That is, it is completely redundant. This issue came up four times in prosecution, and each time the PTO identified the separation method and exemplified it as including both capillary electrophoresis and HPLC, which they use. I'm out of time. I thank you very much. Thank you, Mr. Frank. Ms. Millich, you have a little over three minutes. Thank you. Judge Moore, if you need any more questions on why this test, USP-207, is required, I'm happy to address them. But you identified the statutory provisions on 97, 98, and 96 of the addendum to our brief that make it mandatory to use the USP test. The second point I want to make is that this is a narrow situation. Is there another test? Is there another test that will satisfy the FDA under the statute? No. Are there other tests that are out there? Does it make a difference whether there's other tests? So whether it would to a textual analysis of the safe harbor, I think, and it could be a complicated question, another one. The FDA has said what it wants, and it's not only that Congress has said— No, but under the 271, suppose there are two test methods. Right. And you have to do one or the other to get, to meet the regulatory requirement. What difference does it make that there are two tests instead of one? Does it make any difference? I don't think it makes any difference. The only hypothetical that I would reserve is— What if one's patented? Exactly that one. If one isn't, then there would be the question whether it's reasonably related to pick the patented one rather than the other one. But this situation bears one, and it is the one that is— They can't shoot from the hip here and find things that are kind of good. There's a reason the USP says equivalent or better. This is life-threatening technology if not done correctly. And look at their patent and look at the USP. USP says there are four peaks that show 1,6-AS under HPLC. You can't do their patent, which tells you to look at one peak that is not remotely close. You only need an eyeball for this, to 15 to 25 percent of the ingredients of that. You can't use their patent, their test, to do the quality control that is required in that patent. That is a patent for quality control that tells you not one word about how to find 15 to 25 percent under four peaks. But again, the narrowness of this is that you have this odd situation where there's one test mandated by the FDA. We've found no case where anyone has ever alleged patent infringement based on a USP standard. So this is a narrow situation for purposes of the safe harbor question. The other thing I want to point out is that their harm doesn't fit their arguments. They can't stand here and say for the safe harbor purposes that there are other tests and then say the harm is if they run any tests and get out on the market, our market share will get shut down. Their harm argument is about us not being able to do any other tests and staying off the market. This is a testing method. You don't get to keep people out of the market with a testing method. If we follow you, will all manufacturing control method patents be worthless? No, absolutely not. There will only be those that fall within the safe harbor provision that are pre-approval. But they all do. If they're manufacturing control methods, they're all going to be information that's supplied at some point long after the drug has come out, which was the purpose of Patch Waxman. I was there. I wrote that. So I know what it was meant to do. So long after that has been accomplished, you're going to render all these patents worthless. Well, precisely the point that you raised, and that is this is a narrow situation where there is one mandated approach by the FDA, one test and one test only. If there are other ones and you make the choice, one could argue that's not reasonably related under the safe harbor, that that's not where it was intended to go. But that's not the situation, and the point here is that there's one path that's been blocked off, and it is in terms, in regulatory terms, pre-batch approval, pre-marketing, pre-sale. This gets us to the starting gate. And if you shut it down, you shut down all generic competition, which most assuredly was not the aim, I apologize, of the Hatch Waxman Act. If there are no further questions. Thank you. Thank you.